## P. & H. Ham *against* Schuyler and others.

1819.

Ham
v.
Schuyler.

Where a farm had been occupied and cultivated for above eighty years, during which time the original tenant and his descendants uniformly paid rent to the landlord, built houses, and made valuable and permanent improvements on the premises; *Held*, that a lease in fee, at the acknowledged rent, was to be presumed to have been originally given, or, at least, that there was an *agreement* for such a lease, under which the tenant took possession, and upon the faith of, and in execution of which, he made his improvements.. Equity, as well as a court of law, or a jury, may make such presumption: Decreed, accordingly, that the devisees, or those claiming under the original landlord, execute such a lease, with the usual covenants contained in ancient leases in fee of lands in the same tract or manor of the lessor.

*Nov.* 13, 1818, and *Jan.* 8, 1819.

THE bill of the plaintiffs stated, that in 1730, *Casper Ham*, the grandfather of the plaintiffs, with the consent of the proprietor of the manor of *Rensselaer*, entered into possession on the east side of the *Hudson* river, of a part of the manor then being a wilderness, except a few settlements near the river. That *Casper Ham* had the promise of a lease

from the proprietor, and paid an annual rent. That some time previous to the year 1760, the land was transferred to *Elizabeth Ten Broeck;* and between 1760 and 1780, *Abraham Ten Broeck,* her husband, became solely seised of the tract. That after the transfer, the proprietor of the manor assured *Casper Ham* that he should still hold the land, as his other tenants, paying to *Abraham Ten Broeck* the rent. *Casper Ham* continued in possession, and paid rent until his death, about fifty years ago. He left *P. Ham,* father of the plaintiffs, his only son and heir at law, who continued in possession, made valuable and permanent improvements on the premises, and paid rent to *Abraham Ten Broeck,* at the rate of twenty-five skipples of wheat, or five pounds in money, until 1786 or 1787, when a general survey of the manor was made. From that time, until his death, in 1808, *P. Ham* paid rent, at the rate of one shilling per acre, two loads of wood, and four fowls, annually. A survey of the farm, which included the premises in question, was made between 1760 and 1770, by order of *Abraham Ten Broeck,* and the survey contained 260 acres. *P. Ham,* about forty years since, built a large house on the premises, and made valuable improvements thereon. *Casper Ham* planted an orchard, more than sixty years ago, and cleared and inclosed more than fifty acres. In 1798 or 1799, *Ten Broeck* directed *P. Ham* to pay some arrearages of rent, and to sell his improvements on fifty acres to one *Filkin;* and he accordingly sold them to *Filkin,* for 250 dollars, and *Ten Broeck* executed a lease for three lives to *Filkin.* At various times, afterwards, *Ten Broeck* promised to give *P. Ham* a lease for lives of the farm, at the usual rent, before paid by the father of the plaintiffs. The bill further stated, that *Ten Broeck* afterwards refused to execute a lease; that *P. Ham* continued to work and improve the land, believing that he had a permanent interest in it, and that *Ten Broeck* or his heirs were bound to give him a lease for lives, if not a greater estate. That *P. Ham* made his will, devising seventy acres to his son, *Casper Ham,*

and the residue to his other sons, *Andrew* and *John,* and the plaintiffs, equally, who divided the same between them, and have continued to make valuable and permanent improvements on the lots, believing that they had a valuable interest in the land, which would be protected in law or equity.

That *Ten Broeck* died in 1810, and by his will, dated *March* 27, 1809, devised the premises to his daughter *Margaret,* who devised all her real estate in the county of *Rensselaer, June* 9, 1812, to her sister *Elizabeth,* wife of *Rensselaer Schuyler,* during life, and after her death, to her children, living at the time of her death, in fee; and if she died without leaving lawful issue, at the time of her death, then to the children of her brother *Dirck,* equally, in fee. *Rensselaer Schuyler,* and *Elizabeth* his wife, on the 6th of *January,* 1813, sold to *James Kane,* 645 acres, including the premises in possession of the plaintiffs, during the life of *Elizabeth.* The bill was filed against *Rensselaer* and *Elizabeth Schuyler, James Kane,* and the children of *Dirck Ten Broeck,* having an interest by way of contingent remainder. The devisees refused to execute the agreement for a lease, so stated to have been made by *Abraham Ten Broeck,* gave notice to quit, and brought an action of ejectment against the plaintiffs, to recover the lots in their possession. The bill prayed that a lease for three lives might be decreed to be executed by the devisees, according to the agreement made with *Abraham Ten Broeck,* and for an injunction, &c.

The defendants, in their answers, denied their knowledge or belief of the material allegations in the bill.

The material parts of the evidence are sufficiently stated in the opinion delivered by the Chancellor.

The cause was argued by *Woodworth* and *Van Buren* (Attorney-General) for the plaintiffs, and by *Henry* and *Van Vechten* for the defendants.

*(margin:)* 1819.

HAM
v.
SCHUYLER.

*Nov.* 13, 1818.

CASES IN CHANCERY.

*For the plaintiffs*, it was contended, 1. That the facts proved were sufficient to afford the presumption of an agreement, in 1730, between the proprietor of the manor of *Rensselaer* and *Casper Ham*, for a perpetual lease, at a rent of one tenth, which was, afterwards, by agreement of the parties in interest, modified as to the rent, and converted, at *least*, into an agreement for three lives. (12 *Vesey*, 239. 2 *Vernon*, 516. *Roberts on Frauds*, 135.) 2. That the proof of acts of part performance were sufficient to take the case out of the statute of frauds; and that the improvements made at the instance of the respective proprietors, with a promise of security, entitle the plaintiffs to a lease for three lives, at least. (*Roberts on Frauds*, 141. note. *Powell on Contracts*, 296. *Newland on Contracts*, 183.) 3. That the plaintiffs, at all events, were entitled to be paid for their improvements before the injunction was dissolved.

*For the defendants*, it was contended, That antiquity of possession was no ground for this Court to presume an agreement for a lease, or to direct one to be given. There was no satisfactory evidence of any communication from the proprietor of the manor, as to the particular estate to be given *Casper Ham*. The plaintiffs are compelled to resort to the promise of *Ten Broeck*. Then the statute of frauds is a defence which can only be avoided by showing *fraud*, or acts of *part performance*, neither of which is alleged in the bill. Improvements made on the premises cannot be considered as acts of part performance. Besides, the permanent improvements were all made before the promise of *Ten Broeck*, in 1803. The rent was merely nominal. There can be no equitable claim for improvements.

*Jan.* 8, 1819.     The cause having stood over for consideration, the following opinion was now delivered by the Court.

THE CHANCELLOR. This case affords a necessary presumption, either of a lease in fee to *Casper Ham*, the ancestor of the plaintiffs, from *Van Rensselaer*, the proprietor of the manor, or of an agreement for such a lease.

The premises are included in the manor of *Rensselaer ;* and *Casper Ham* took possession, some time in the former part of the last century, of about 300 acres of land, of which the premises are a part. The precise time cannot be ascertained, though the family tradition is, that he entered in or about the year 1730. His daughter *Maritje*, who was eighty-five years of age at the time of her examination, fixes upon that period, and speaks from information and belief derived from her early life. There is no doubt, that *Casper Ham* took possession under the proprietor of the manor, at some distant period of time beyond the memory of man, and that he continued in possession, making valuable improvements, and exercising various acts of ownership, down to his death, in the year 1777. The rent that *Casper Ham* paid is ascertained, not merely by the faint recollections or traditional information of his family, but by authentic written testimony. In the books of *Abraham Ten Broeck*, there is a charge, in 1766, against *Casper Ham*, for three years rent, at twenty-five skipples of wheat, four fowls, and two loads of wood a year ; and there are several other entries to the same effect. As to the length of time in which *Casper Ham* occupied the land, we find in the same books, of the date of *January*, 1799, a charge of thirty years rent due from *Casper Ham*, and this carries his occupation back thirty years from 1777. These charges, also, show the nature and amount of the rent paid, or due, to the proprietor of the manor, *before* the sale by the proprietor to *Ten Broeck* and his wife, in 1764.

It is in proof, that the adjoining manor lands are generally held under leases in fee, subject to an annual rent.

When *Casper Ham* died, in 1777, his son *Peter* was his

heir at law, and he continued in possession of the inheritance derived from his father. We find him

*Gaudentem patrios findere sarculo*
*Agros.———*

He made valuable improvements, and exercised various acts of ownership down to his death in 1807. He paid the same rent that his father had paid to *Ten Broeck,* viz. twenty-five skipples of wheat, two loads of wood, and four fowls, until, by agreement, the payment in wheat was commuted for a payment in money, at the rate of one shilling per acre. Of the payment of the rent by *Peter Ham* there is abundant proof. He sold, in his life-time, fifty of the 300 acres, descended to him from his father, to one *Filkin,* with the assent and approbation of *Ten Broeck,* for 100 pounds ; and *Ten Broeck* gave credit to *Peter Ham* for that sum, in October, 1799, as so much money received from *Filkin,* to whom *Peter Ham,* " with his consent," had given up fifty acres " of what he had under improvement." *Ten Broeck* afterwards gave *Filkin* a lease for three lives of those fifty acres, at the rate of one shilling an acre.

*Peter Ham,* by will, devised his farm of 250 acres (deducting the fifty acres sold to *Filkin*) to his five sons, in different proportions ; and it is in proof that those devisees continued, after the death of their father, to pay, and *Ten Broeck,* and after his death, his representatives, to receive, the same rent of one shilling per acre, and two loads of wood, and four fowls a year, down to a period as late as 1813.

Here, then, we have the striking fact of a farm occupied and cultivated, under a steady and uniform rent, for three generations, and including a period of upwards of eighty years ; and yet, according to the allegation on the part of the defendants, the plaintiffs, and their ancestors, were nothing, during all this time, but mere tenants at will. The fact is utterly incredible. The ancestors of the plaintiffs claimed a permanent interest in the soil, and their va-

rious, constant, and expensive improvements corresponded with such a claim. There is one fact which shows an unequivocal recognition of the claim by *Ten Broeck*, the owner of the rent. He consented that *Peter Ham* should sell fifty acres to *Filkin*, and he received from *Filkin* 100 pounds, being the consideration of such sale, and gave *Peter Ham* credit for that sum, on his arrearages of rent. Can we reasonably suppose, that *Ten Broeck* considered *Peter Ham* as a mere tenant at will, when he allowed him to demand, and *Filkin* to give, 100 pounds for only fifty acres of the farm, and to receive himself from *Filkin* the fruits of the purchase ? If *Filkin* bought only a possession held at will, such a price, given twenty years ago, was the grossest imposition and extortion, under the sanction of the landlord. I have too much respect for the memory of General *Ten Broeck* to believe that he then viewed the interest of *Peter Ham* in so trivial a light.

We must presume, that a lease in fee, under the acknowledged rent, was originally given to *Casper Ham*, and equity may make such presumption, as well as a Court of law and a jury. (*Steward* v. *Bridger*, 2 *Vern.* 516. *Hillary* v. *Waller*, 12 *Ves.* 252. 269.) But if that presumption cannot be indulged, because the witnesses seem to have understood that neither of the *Hams* ever pretended that such a lease was actually executed, we must then conclude, that there was an original agreement for such a lease, and that the elder *Ham* took possession under that agreement, and made his improvements, from time to time, upon the faith of it, and in execution of it. The agreement was not a lease for lives. The facts afford no foundation for that inference. The land was occupied, and the rent paid, through successive generations; and if those facts are evidence of any original agreement, they must be of an agreement for a perpetual lease, according to the custom of the manor, upon the reservation of the rent afterwards, and constantly, paid. The delivery of possession may amount to part

1819.

HAM
v.
SCHUYLER.

performance; and the fraud consists in permitting this pos-session to take place, and in leading on *Casper Ham* and his son, through a period of fifty years, to expend money and labour in the melioration of the estate, and then to withdraw from the performance of the agreement. " Pos-session is so strong a title," said Lord *Northington*, " that a judge may have emphatically said, he would presume an act of Parliament to support and confirm it." (1 *Eden's Rep.* 296.)

It is proved that *Ten Broeck* and *Peter Ham* did agree to a lease for lives; but that agreement, which was a sub-stitute for the original one which I have presumed, was by parol, and never carried into effect, and cannot be enforced. The lives are not ascertained, and we are obliged to recur back, and to exact a performance of the original agreement for a lease in fee, subject to the variation in the rent of the one shilling an acre, for the skipples of wheat, and which was for many years executed and acted upon by both parties.

I shall accordingly decree, that the defendants execute to the plaintiffs a lease in fee, for the two pieces of land de-scribed by metes and bounds, in the depositions of the wit-nesses, the one containing eighty-two, and the other ten and a half acres; that the annual rent to be reserved thereon be eleven dollars and fifty-six cents, together with two loads of wood, and four fat fowls; and that the lease contain the usual stipulations and covenants in the ancient leases in fee of lands in that part of the manor of *Rensselaer*, lying east of *Hudson's* river; and that it be referred to a Master to ascertain and settle the form of such lease, and report the same; and that the question of costs, and all other ques-tions, be, in the mean time, reserved.

                                 Decree accordingly.